Patricia CARTER, Plaintiff,

v.

SHOP RITE FOODS, INC., Defendant.

Civ. A. No. CA–3–74–620–G.

United States District Court,
N. D. Texas,
Dallas Division.

May 2, 1977.

Linda N. Coffee of Palmer, Palmer & Coffee, Dallas, Tex., for plaintiff.

Marvin Menaker of Bader, Wilson, Menaker, Cox & Branson, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

### I.

### BACKGROUND

PATRICK E. HIGGINBOTHAM, District Judge.

In 1974, Patricia Carter filed suit on her own behalf as well as a proffered class of females claiming Shop Rite Foods, Inc. (Piggly-Wiggly), her employer, and Amalgamated Meat Cutters Union, Local 540 (Meat Cutters Union), had discriminated on the basis of sex against her and the class she would represent. Ms. Carter charged that Piggly-Wiggly and Meat Cutters Union have excluded females from management, (store manager, assistant store manager, produce manager, clerk in charge, head meat cutter, journeyman meat cutter, apprentice meat cutter, courtesy clerk and supervisor) and otherwise discriminated in terms of job assignments, working conditions and terms of compensation. On September 12, 1975, Judge Robert M. Hill certified a class of ". . . those female persons who are presently employed or have been employed since June 6, 1973 at one or more of the defendant's 'Piggly-Wiggly' supermarkets that comprise the Dallas districts". The certified class issues included (a) job classification, (b) promotional system, and (c) job assignments, working conditions and terms of compensation.

Shop Rite Foods, Inc. (Shop Rite or Piggly-Wiggly) is a New Mexico corporation with its principal office and place of business in Grand Prairie, Texas, a municipality contiguous to the City of Dallas. Shop Rite's principal business is the operation of a chain of supermarkets and convenience stores in Texas, New Mexico and Oklahoma, at the time of suit divided into at least seven divisions, each handled by a district manager.

Two unions represent Shop Rite's employees in the Dallas district. The meat cutters

and meat wrappers are represented by the Amalgamated Meatcutters Union, Local 540. Other employees are represented by the Retail Clerks Union, Local 368.

Shop Rite was at the time of suit a substantial well-established company operating in much the same markets since 1953. During the long pendency of this suit, Shop Rite's financial picture has changed substantially, at least the size of its operation in the Dallas district has changed. When Ms. Carter on July 2, 1974 filed her charge with the EEOC, there were 20 "Piggly-Wiggly" stores in the Dallas district. Beginning some time after June, 1975, a number of stores were either "sold" to former store managers or were closed. From May 17, 1975 to about October 19, 1975, the Piggly-Wiggly stores of the Dallas district were struck by the retail clerks. The "sales" of the Dallas stores occurred during this strike-torn period of the summer of 1975.

Although Ms. Carter had originally sued not only her employer but also the Retail Clerks Union, on June 12, 1975, Judge Hill, at Ms. Carter's request, dismissed without prejudice the suit as to the union.

This court bifurcated liability and relief and the liability phase was tried to the court. Because the "sales" by Shop Rite to its "former" employees raise substantial questions as to its continuing liability, these findings will be confined to the time period June 6, 1973 to June, 1975. The effects of the "sales" will be factually related to question of relief.

## II.

### SHOP RITE'S STORE PERSONNEL

This case concerns the hierarchy of a food store. Although there are many stores involved, all had virtually identical personnel structures. At its apex is the store manager supported in turn by the assistant store manager, third man, and produce manager, with a meat cutter on a close, if not the same, level.

The union bargaining unit in ascending order included the third man but not the assistant manager. Although not as marked, there was a descending line after third man, all within the bargaining unit, including checker, office girls, non-food clerks, price checkers, and meat wrappers.

There was no formal policy regarding promotion. Promotion was the decision of those higher up. There were no job descriptions related to job qualifications, nor were job vacancies posted. Promotion was the subjective decision of the superiors. The usual line of progression was promotion from third man, out of the union, to assistant manager and to store manager. It was the policy of Shop Rite at least until June, 1975, to promote its employees to fill management vacancies.

The evidence presents paradigmatic sex discrimination. This is not a case of subtle corporate seduction of female rights to equality of employment opportunity, it is a case of rape. Virtually all checkers were at all times women—the same was true of office girls, non-food clerks, price checkers and meat wrappers. And virtually all stockers, store managers, assistant store managers, third men, meat cutters, district level supervisors and district managers were men. Only possibly two women were ever produce managers despite the fact that from January, 1972 until June, 1976, there were at least 71 vacancies in the position of produce manager, and true to fashion, package boys were boys.

The issues of job assignment and promotion are inevitably intertwined in a personnel structure which locks out. And there must have been a lockout of women from store management. Women are not strangers to the employee rolls of these stores. As late as February 28, 1975, 42% of the food clerks and 100% of the meat wrapper positions were occupied by women. Shop Rite's EEOC-1 report dated April 27, 1972 revealed 893 employees classified as officials and managers with 865 listed as male—a 97% male management force.

In December, 1973, Shop Rite told its employees that it planned to create a position of head cashier to free the store managers of paper work; that this would be a

"first step" toward making women managers. Nothing came of the plan.

Shop Rite attempted to explain the paucity of women in management by pointing to the fact that jobs outside the bargaining unit had no job security, required longer hours, and in general were not desirable. This argument ignores several facts. First, why would these undesirable features cut along sex lines? Second, at least through June, 1975, the hierarchy of position was also a hierarchy of compensation. Stated more directly, the "undesirable" jobs paid more. It is true that loss of job security from loss of union membership was a retarding factor. Several of the women who were finally offered management jobs were offered the jobs by a manager who pointedly reminded them of his power thereafter to fire them preemptorily. In other words, the loss of security attendant upon promotion into management was in fact a tool to preserve the predominant male domain. Third, defendant's position fails to account for the fact that both "third man" and "produce manager" were in the bargaining unit. Despite the absence of the retarding impact of loss of job security, there was no female movement into these positions. This was true despite the fact that both positions paid (at pertinent times) more than checker, the position below.

If all this be insufficient, there was direct evidence of discriminatory purpose and intent in the form of direct testimony.

In sum, Shop Rite's personnel structure was maintained by job assignment, and it preserved better paying and supervisory jobs for males.

## III.

### JOINDER OF THE UNION

The defendant has argued that the unions are necessary parties although the plaintiffs seek no backpay from them and claim that they are not essential to correction of employment discrimination. None of the job classifications seem to be frozen in, or even to have their genesis in a union contract. Only the meat cutter class presents a question. Union requirements for promotion to the job of head meat cutter were that one be a qualified journeyman meat cutter; that openings in the apprentice and meat cutter classification be offered first to meat wrappers. Plaintiffs do not attack this union bargained for progression pointing to the fact that it was open ended at its bottom to meat wrappers.

Evidence as why female meat wrappers did not progress to apprentice meat cutters is meager. There was a suggestion of a weight lifting requirement but no evidence that it was a union requirement. While plaintiffs seem to question the confinement of job offers for apprentice meat cutters to meat wrappers (Plaintiff's Post-Trial Brief, page 6), they have failed to prove that such a requirement is discriminatory in purpose or effect. It is undisputed that the meat wrappers were virtually all women. With virtually all male meat cutters, the reasons must lie elsewhere. Plaintiffs seem to urge that the frozen job assignment structure prevents the offer of apprentice meat cutter jobs to other female employees when declined by the female meat wrappers. Defendant offered no explanations for this absence of female meat cutters. The only evidence is that *Shop Rite* required a meat cutter to be able to lift and handle 100 pound weights. That evidence, though on *this* record not well developed, when coupled with the statistics relating sex to job classification, is sufficient to convict defendant of job discrimination. Whatever the explanation for this phenomena, there is no evidence that any union-management contractual provision is the cause of or will be altered by any foreseeable relief. In sum, the unions are not necessary parties.

Defendants also argue that Ms. Carter is an inadequate class representative for failure to sue the unions. The adequacy of the class representation has been determined. The court's view remains unchanged from its view that the class is well represented. It is prudent, not improvident, to name no more defendants than necessary. While another defendant is another purse, it is also another sword.

EXPLICIT FINDINGS

Although many are implicit in the foregoing narrative, the following are explicit findings of fact and conclusions of law.

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Defendant is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Plaintiff filed her EEOC charge on June 6, 1973.

4. All time requirements have been met by Plaintiff in filing her EEOC charge and the present action.

5. Defendant has never employed a woman in the position of store manager at any of the "Piggly-Wiggly" supermarkets which it has operated in its Dallas district.

6. Defendant has never employed a woman in any of its meat cutter classifications at any of the "Piggly-Wiggly" supermarkets which it has operated in the Dallas district.

7. Defendant has never employed a woman in any of its district level supervisor classifications in its Dallas district.

8. For the period from July 2, 1964 until July 2, 1974 Defendant never employed a woman as district manager of any of its districts.

9. Defendant may have employed one or two women in its Dallas district briefly in the position of produce manager, although defendant was unable to identify any such women in its answer to plaintiffs' interrogatories.

10. From September 1, 1967 to June, 1975, defendant never employed a woman in the position of assistant store manager at any of the "Piggly-Wiggly" supermarkets which it has operated in its Dallas district.

11. For the period from September 1, 1967 until the present, all of the meat wrappers in the Dallas district have been women.

12. For the period from September 1, 1967 until the present all of the courtesy clerks ("package boys") in the Dallas district have been males.

13. For the period from September 1, 1967 until June, 1975, no woman was ever assigned to the unofficial position (in the sense of not being recognized in the union contract) of clerk in charge or third man.

14. For the period subsequent to June, 1975 few if any women have been assigned to the position of head clerk or third man.

15. At all relevant times both the unofficial position of clerk in charge and the official position of head clerk were generally referred to by store personnel as third man.

16. Defendant never employed a woman in the position of store manager at any of its "Piggly-Wiggly" supermarkets in any of its several districts until January 13, 1974.

17. Defendant has been doing business since 1953.

18. For the period from January, 1972 until June, 1976, there were at least 84 vacancies in the position of store manager.

19. For the period from January, 1973 until June, 1976, there were at least 131 vacancies in the position of produce manager.

20. For the period from January, 1972 until June, 1976 there were at least 71 vacancies in the position of produce manager.

21. At all relevant times female food clerks have been restricted to the traditional job assignments of checker (and sometimes office girl) and have been referred to by store personnel as "checkers".

22. At all relevant times male food clerks have been given the traditional job assignment of stocker and have been referred to by store personnel as "stockers".

23. On February 28, 1975, 42% of the full time food clerks in the Dallas district were women.

24. Defendant maintains a policy of promotion from within, whenever possible.

25. As of August 28, 1975, defendant had not instituted an affirmative action program for women.

26. As of April 27, 1972, 25.6% of defendant's total number of employees were female.

27. As of April 27, 1972 only 28 out of 893 employees were classified by defendant as managers or officials in its EEO-1 form.

28. Defendant's female employees were not generally notified of the existence of vacancies in the classification of store manager, assistant store manager and produce manager.

29. Promotions to the positions of store manager, assistant store manager and produce manager were not based upon objective factors capable of review.

30. Promotions to the position of store manager, assistant store manager and produce manager were based on vague, subjective factors.

31. Defendant's female employees were never informed of the requirements for promotion to the position of store manager, assistant store manager, produce manager, head clerk (third man) and the various district supervisor classifications.

32. With the exception of the meat wrappers, defendant's female employees were never informed of the requirement for selection as apprentice meat cutters.

33. Defendant had no established procedure whereby employees could apply for the positions of store manager, assistant store manager, produce manager, head clerk (third man) or the district level supervisory positions.

34. Several of defendant's female employees requested as best they could consideration for promotion to defendant's management positions.

35. Several of defendant's female food clerks indicated to their store manager that they would prefer to be assigned to the duties of a "stocker" rather than "checker".

36. One of the defendant's store managers asked for permission from the Dallas district manager to make plaintiff, Patricia Carter, his assistant manager, but was refused.

37. On several occasions various female employees were told by various management personnel that defendant did not consider women for its various management positions.

38. Female employees often were not taken seriously when they attempted to express their interest in being promoted to various management positions.

39. On a number of occasions various store managers and district level supervisors of defendant made statements reflecting overt bias against female employees.

40. Beginning sometime in 1973, defendant adopted a policy of not hiring full time women. Thereafter significantly fewer full time women were employed than full time men.

41. The collective bargaining contract between defendant and the union representing the meat wrappers requires defendant to offer openings in the apprentice meat cutter classification first to the meat wrappers.

42. In its letter to the meat wrappers notifying them of an opening for apprentice meat cutter, defendant stated that one of the requirements for the position was the ability to lift and handle weights in excess of 100 pounds.

43. Defendant's weight requirements for the meat cutter positions disproportionately affects women.

44. Defendant operated 20 "Piggly-Wiggly" supermarkets in the Dallas district when this lawsuit was filed on July 2, 1974.

45. In June of 1975, Defendant purported to sell a majority of its "Piggly-Wiggly" supermarkets in the Dallas district to various independent owners, all of whom were former store managers or supervisory personnel of Defendant. Plaintiffs contend that notwithstanding the alleged sale, Shop Rite retains sufficient control over the operations of the "sold" supermarkets to remain the true employer for purposes of Title VII. The legal effect of the alleged sale on Shop Rite's continued liability subsequent to June, 1975 will be determined at the relief stage of this litigation.

46. All of the so-called independent owners of the Dallas district "Piggly-Wiggly" supermarkets are and have been men.

47. Plaintiff Patricia Carter was offered the position of assistant manager by the "independent operator" of her store in December, 1975. The store "owner" discouraged Plaintiff Carter from accepting the position by telling her *inter alia* that she would have to work seven days a week, would lose her union benefits, and would get no increase in pay. The store owner told other employees that he intended to terminate Plaintiff Carter if she accepted the position of assistant manager. Plaintiff Carter declined to accept the position offered because she believed she would be terminated if she accepted it, and because the position as outlined to her appeared to be economically less desirable than her clerk position.

48. Intervenor Joyce DeBord was offered the position of assistant manager by the "independent operator" of her store in January, 1976. The store owner offered her the position at a salary of only $210.00 a week. DeBord declined the position offered because the total economic benefits of the position offered were less than those of her clerk position. DeBord was not offered the position of store manager which paid $250.00 a week. DeBord was not allowed to take the position of head clerk which she actively sought.

49. Mary Dunafon was offered the position of assistant manager by the "independent operator" of her store. Dunafon declined the position offered because she believed she would be terminated if she accepted the position.

50. Defendant's Dallas district is located in the Dallas-Fort Worth Standard Metropolitan Statistical Area.

51. At all relevant times females have represented approximately 50% of the population in the Dallas-Fort Worth S.M.S.A.

52. At all relevant times, females have represented a substantial percentage of the labor force and of the unemployed in the Dallas-Fort Worth S.M.S.A.

53. Defendant contends that Plaintiff Carter voluntarily quit her employment on July 21, 1976. Plaintiff Carter contends that she was forced to quit because of the adverse working conditions to which defendant's agents deliberately subjected her. This issue will be resolved at the relief stage of this litigation since its only importance relates to the amount of backpay, if any, to which Plaintiff Carter may be entitled if she prevails at the relief stage of the litigation.

54. Intervenor Rosemary McDowell attempted to apply for full time employment with defendant in June, 1974 but was told that defendant was not hiring any full time women. Subsequent to June, 1974, defendant hired numerous full time male employees. McDowell was denied full time employment with defendant because of her sex.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and subject matter of this action.

2. Defendant at all relevant times has been an employer within the meaning of Title VII.

3. The evidence regarding the absence of women in the positions of store manager, assistant store manager, produce manager, meat cutter, courtesy clerk ("package boy"), and supervisor establishes a *prima facie* case that such absence was due to discrimination against women as a class.

4. Plaintiffs' *prima facie* case of discrimination against women is further buttressed by substantial evidence of overt (and in some instances blatant) discrimination against female employees on the part of defendant and its agents.

5. Defendant has failed to rebut plaintiffs' showing of discrimination against women as a class.

6. The evidence that male and female food clerks have been assigned to the traditional job duties of "stocker" and "checker" respectively establishes a *prima facie* case that such assignment was due to discrimination against women as a class.

7. Defendant has discriminated against its female employees in the area of working conditions.

8. Evidence that women have been offered assistant manager positions at a time when it became distinctly less advantageous to occupy such positions does not rebut plaintiffs' showing of unlawful exclusion of women from those positions.

9. The pattern of discrimination on the basis of sex evidenced in this case is prohibited by Title VII of the Civil Rights Act of 1964.

10. The plaintiff class is entitled to injunctive and affirmative relief designed to eliminate the effects of the past and present unlawful employment practices of defendant.

11. The plaintiff class is presumptively entitled to backpay.

12. Any conclusion of law deemed a finding of fact is so adopted.